May it please the Court, I'm Yale Lewis of Hendricks & Lewis, representing the Plaintiff Playmakers. Playmakers, LLC, is a Washington entity. With me are State Soleil and Kari O'Neill, also of Hendricks & Lewis. I'd like to reserve five minutes, and I understand that I only have, therefore, five now. All right, Your Honor. Thank you. I would like to use the time that I have to address two issues. One is the importance of tarnishment evidence in a reverse confusion case such as this, and the other I would like to talk about the continuing importance of the request for a preliminary injunction. If the Court has another preference, of course, I would be happy to address that. The problem is several-fold, Your Honor, with the tarnishment issues. The district court, in a published opinion, which is the only published opinion in this district addressing this issue, held as follows. Quote, tarnishment is only a form of delusion. Two, tarnishment applies only when the senior user's mark is distinctive or famous. And then concluded correctly that because plaintiff's marks are neither or are not famous, our company, the plaintiff is not a rich and famous company, its mark is not famous, that there is no protection. Now, that's just wrong as a matter of law in this circuit and everywhere else. There are two purposes of the Lanham Act, one of which, as the Supreme Court said in Park and Fly, is to secure to the owner of the mark the goodwill of his business. That's one of the purposes of the Lanham Act. Tarnishment has been recognized all over the country in all of the courts, in all the circuit courts, as a fundamental analysis to be applied in confusion cases. And I want to make this point, underscore this point, every case that is cited in Playmaker's brief on the subject of tarnishment was a confusion case. None of them were delusion cases. So I think when the district court concluded that tarnishment was limited to delusion and therefore only applicable under the Federal Delusion Act, the court made a fundamental error which requires reversal not only for our case but as a matter of precedent in this district. The concept of tarnishment, as I think we all know, preexisted the Federal Anti-Delusion Act. It existed long before the Federal Delusion Act when there was only confusion cases. The federal courts have ported the concept of tarnishment into the Federal Anti-Delusion Statute, but that doesn't take it out of traditional confusion analysis, a fundamental concept in which the district court made a fundamental error. The result of the district court's conclusion is that tarnishment, which has always been a fundamental aspect of confusion cases, is no longer available to any company except a rich and famous company with a rich and famous mark. Again, fundamentally wrong. That requires reversal again for the benefit of the district as well as the plaintiff in this case. Now, the court would say, well, if we are going to consider tarnishment, how should the district courts consider tarnishment in a confusion case, which this is? And what we ask the Court to conclude, to hold here as a point of clarification to the extent that's necessary, is that where there is overwhelming evidence of the junior user, ESPN in this case, use of an identical mark to that of the plaintiff appellant. You say identical mark? I did say identical. Your Honor, they are both playmakers. Yeah, they sound identical, but they don't look identical. Your Honor, the plaintiff has a registered mark that is incontestable for the block playmakers. The PTO has granted a mark which is now incontestable to any use of the mark P-L-A-Y-M-A-K-E-R-S. In the style in which it's registered. It's a block. Your Honor, there are two registrations. One is simply the block registration playmakers. That's the way it would appear in a newspaper article about the subject. That's the way it appears in magazines. That's the way it appears on letterhead. That's the way it appears on the television programs. Any affidavits? Yes. Yes, Your Honor. There are not declarations of the person who was confused, Your Honor, but there are declarations in the record of a playmaker official, the director of football operations, who testified by declaration that he had been called by half a dozen different people, some of whom were clients and some weren't, expressing confusion and asking if playmakers was not concerned with this particular television program. The important part, Your Honor, is that. Go out and do a survey, huh? Have a focus group to go out and get affidavits from people who say, yeah, I saw this, and I thought it was that, so there's a confusion as to source. So the public's deceived. Your Honor, the problem in a case like this is the market is professional football players and actually more perspective or aspiring professional football players and their families and friends. That's not a market that one can go out and identify. No, sir, it's not, Your Honor, because the schools do not make that type of information available. It's prohibited by the NCAA, and the schools don't give you telephone numbers and addresses of the college athletes who are aspiring professional football players. So. College football game, and you could ask some of the players. Your Honor, you can't go into a football, into a locker room before or after a game, before or after. Oh, they are. You read the sports pages, you know, the local newspaper. Your Honor, Playmakers is a professional representation agency. The rules would not permit, in my opinion, a Playmaker agent to approach a college football player who still had eligibility and talk about anything. It's not. Eligibility. The eligibility, Your Honor, the NCAA rules prohibit agents from making that sort of contact with college football players who still have their eligibility. I think if Playmakers were to engage in that, it would be just fraught with danger, both for the individuals who were approached as well as for Playmakers, which has to maintain eligibility in order to function as a sports agency. Eligibility. The problem, Your Honor, is this. How do they get their business? Playmakers gets its business by contacting players whose eligibility has expired after their last football game or their last basketball game. So then Playmakers, normally it's set up, schools set it up,  That's the time you could send somebody out there and say, look at this, look at this. What do you think this is? Well, Your Honor, in this particular case, the timing was such that wouldn't have been possible. The preliminary injunction was the advertisements appeared in August. The complaint was filed. The preliminary injunction was sought. The hearing all happened before or during the college football season. That simply wasn't possible. But, Your Honor, let me approach it again, if I may get back to the tarnishment issue. There is overwhelming evidence in the record that the reaction of the potential class, professional football players, was so negative to the Playmakers series that it was canceled by ESPN. Overwhelming evidence of tarnishment. The program appeared, Playmakers, Playmakers, Playmakers, Playmakers. And the reaction of the target consumer class, if you will, the professional football players, was overwhelming. And it was so overwhelming that the series sponsor, even though they took the position it was a fantastic show, canceled it expressly because of the negative reaction of the football players and the National Football League. So the tarnishment was so great that the series was dropped. Now, from the standpoint of Playmakers, the concern is not somebody who actually knows Playmakers, the appellant, well, because they would know that there was no association. The problem is in this big winnowing out process, Playmakers never knows the family, the football player, the potential football player who simply tosses the Playmaker letter of solicitation because they don't like the connotation. That's the significance of the concept of tarnishment here. It is that the reaction from the target community, the football profession, the aspiring and professional football players and their family was so negative that the series was dropped. Have you got affidavits? Your Honor, we don't need affidavits of that. There's been a public announcement, it's all in the record, that the ESPN dropped the series because the negative reaction of the football community was so strong that they dropped it. There is evidence in the record that Gatorade. Isn't that on your motion to supplement the record? Wasn't that in your motion to supplement? Yes, Your Honor, it was. Technically, I don't think we've acted on that at this point. I mean, we've received it. Well, Your Honor, I think there was a stipulated. I think that was stipulated. But you can stipulate to all you want. Yes, Your Honor, I recognize that. Stipulate to a different law, for that matter. Until you call it a ball or a strike, we don't know what it is. I think you had a stipulation to supplement the record. I've got, there was an ESPN article explaining the NFL's reaction contributed to the cancellation of Playmakers and two, a status sheet showing opposition pending to ESPN's trademark registration application for the series. Yes, Your Honor. Yes, Your Honor. It's also in the record, Judge Pragerson, that Gatorade is a sponsor of ESPN and football games. Gatorade dropped its sponsorship of the Playmakers series because the audience, the negative reaction of the audience to the Playmakers show was so great that Gatorade dropped its sponsorship of the program. There are a thousand agents, people who want to represent football players. There are essentially 50. I don't watch any of that stuff. I watch Book Notes and C-SPAN, too. Well, Your Honor, I don't watch these programs, either. I didn't know, you know, Gatorade and Running for the Woods, you know. Well, that's all in the record, Your Honor. We haven't allowed it yet. Go ahead. I'll look at it. We have to decide what to do. Your Honor, again, the problem is where the evidence of tarnishment is so overwhelmingly great, the risk, the very substantial risk, and this is in the record, that the advisor of a football player, a lot of the football players, when they come out of college, are not from sophisticated, well-educated families. Decisions are made by family members, often coaches, ministers, and they get solicitations from literally thousands, hundreds of agents. The concern is because the negative reaction of the football community to Playmakers has been so strong that they will take the Playmakers solicitation and toss it, that Playmakers will never get to be in that short list of five or so agents or agencies that the player and the player's family set up for interviews. There's overwhelming evidence of that in the record. What does the word Playmakers connote? I mean, if you just see it when I first saw it, maybe it's got something to do with Playboy, you know. That would make it a very strong mark conceptually, if that is true. Playmakers, when the mark was adopted by Playmakers back seven or eight years ago, it wasn't in the dictionary. Then there are no current dictionaries or dictionaries that were current then that had Playmakers in it. A Playmaker was a point guard on a basketball team. At least two of you might remember Bob Cousy, a Celtic point guard. All three of you might think of John Stockton, the Utah Jazz. They were called Playmakers because the point guard on a basketball team— Went to Gonzaga, so I know who he is. Is that John Stockton? John Stockton, yes. I knew all three of you would know who he— I went into a bar in Spokane, worked there, and everybody was going crazy. He was a really good basketball player. And he was known as a Playmaker. He was one of the last guys that lettered in football, basketball, baseball, and I think track for four years at Gonzaga. I didn't know the latter, but I know he lettered in multiple sports. There was only one other person that did it, and that was Quackenbush. Quackenbush? Oh, that accounts for it. All right. Anyway, go on. Your Honor, so the concept that you asked, what does Playmakers mean? At the outset, 10 years ago, it was used hardly at all. It was not a term that was used very much. It referred to the extent it was used to a point guard on a basketball team who brought the ball up the court and then distributed it to another player who would then score. That's the way they do it, yeah. It became occasionally, let's say over the last five years, it would also be applied to a quarterback. He was a Playmaker. Bobby Orr, Bobby Hall might have been described as Playmakers on a soccer team or a hockey team. The Playmaker is a person who brings the ball or the puck up and distributes it to somebody else to score. That seemed to be a fantastic name for a sports agency. It did not refer, I am not a point guard and I'm not a quarterback. This person and this person, whoever was on Playmakers, Playmakers itself was obviously not an athlete. Playmakers wanted to represent athletes. So the connotation was and is that the Playmaker agency would sort of get things positioned for its athletes. It would set the ball up and then distribute it in a way that the athlete represented by Playmakers could score and become a big-time player. More recently, in the last few years, Playmakers has begun to be associated with just a good offensive player who makes big plays. It occasionally is used for a shortstop or a second baseman who makes a double play, starts a double play in baseball. But it is a spectacular name. I think it would be either arbitrary or capricious. In this context, Playmakers, with that background, did not refer to the agency. It was the notion that the agency would perform that function for its players. I think it is conceptually a spectacularly strong name for a sports agency. And it was not a commonly known name when we started. So it is a strong name. It is conceptually strong. Playmakers is registered. This is the word Playmakers in block lettering. Both parties, Playmakers has a registration. ESPN has asked for it. This is no big deal to get something registered. Well, Your Honor, it is a big deal to get something registered. You just send the application in. Oh, no, sir, Your Honor. For example, right now, ESPN has applied for a trademark. ESPN wants to trademark Playmakers for itself. Playmakers, the agency, has opposed that registration. So it is blocked. But, Your Honor, it is not easy to get a name registered. When a name is registered as a mark, ESPN uses it as a mark to identify itself. Playmakers uses it as a mark. So it is used as a mark. When a mark is registered, it means that the PTO has concluded that it is neither generic nor descriptive. It is either suggestive, arbitrary, or fanciful. So, and, my office does a lot of trademark work, and it is very difficult to get marks approved and registered these days because there are so many companies and entities out competing for marks. That, I assume, is partially why ESPN, even though they knew our mark, bombed it. I had this little book out, and I had somebody in New York send me $5. They do the search, and they get you your trademark. You know, so you just send them the money, and they send you the trademark. Your Honor. That was a long time ago. Your Honor, with all due respect, that might have been true at some time in the past. It is not true now. I'll give you a little anecdote that is not in the record, but it is almost, it is extraordinarily difficult for law firms now to get malpractice insurance in trademark law because it is such a precarious issue. Not in the record. I make that as a representation. Trademark law is no longer something that one just sends in something to Thompson & Thompson or someone. Nobody had malpractice insurance. No. Nobody had it. And then the insurance company started selling it. Oh, we'll give you $100,000 coverage for $5 a year. Oh, yeah. Okay. Well, hell of a deal. And then all the lawyers started getting it. And once you got the policies out there, they start suing each other, you see. This is money over there. And then they say, well, we paid off. They send people around to bar meetings. Oh, we just paid a lawyer up in Sacramento. I remember that. He just got nailed for $50,000 and we paid that. And maybe $100,000 is enough. Maybe you better make it $200,000. So they go around and they pay these things off, scare people, and they make a big business out of it, see. Well, Your Honor, maybe in trademark. That's free enterprise. In trademark law, that has become self-corrective because trademark law is considered so precarious now, the insurance carriers don't want to insure a lawyer to do trademark law. It's not so easy now. But, again, going back to tarnishment, which I think is the essence. We cataloged all the mistakes that we think that the Court made in applying the sleep-craft factors. But tarnishment. We've gone through all this. And tarnishment is the issue that really does need to be addressed because it is an important part. It is a traditional part of confusion analysis. It is essential in a reverse confusion case where with some probability, likelihood, evidence of a likelihood of confusion where the junior marker, the junior user overwhelms the market with a negative connotation of the identical word playmaker in the same industry.  Thank you, Your Honor. You made the play. I was going to say good morning, but I think I'll say good afternoon, Your Honors. My name is Robert Raskoff. I'm with you. You're on overtime. You've got three minutes. I've got to hustle. I know. I'm with Whiten Case in New York. That's my colleague, Shannon Jost, from the Stokes Lawrence firm. And Holland Campbell is the in-house lawyer at ESPN. She's here from Bristol, Connecticut. And I'll move quickly, Your Honor. Judge Peckman did a very good job. She applied all of the eight sleek craft factors, though not robotically. She's not supposed to do that, and she didn't. She weighed the factors as seemed appropriate to her, which is exactly what she's supposed to do, which the Brookfield case requires, that the trial judge is supposed to take the relative importance of each factor in a specific case and decide how important they are. That's what she did. She found five of the eight factors in favor of ESPN, only one modestly in favor of the plaintiff, and two were neutral. She then synthesized all the factors, and so she both deconstructed the factors, because she looked at each one individually. Then she looked at the composite, and she called it. She then applied the law appropriate to preliminary injunction cases, which this is. That's the Brookfield case, and found the plaintiff had no likelihood of success or even serious questions going to the merits, and no irreparable injury. Indeed, she found that ESPN would have been the harmed party if there had been a preliminary injunction issue. It certainly didn't weigh sharply in favor of the plaintiff. How does that play out now that ESPN has decided to cancel the series? Well, there's still a lot of commercial exploitation of the Playmakers still going on. In fact, in my hotel room last night, I was watching ESPN here in Seattle, and I saw a promotion for the DVD series of Playmakers, which is out now. There are six figures worth of the box set has been produced. They're on retail today in Seattle and elsewhere throughout the United States. They're also available on ESPN's website. Even though the show's canceled, Judge Bragerson could still get it on DVD. I think the judge could pick up a set if he wanted to. I don't want him to miss it. No, I'm glad you're watching that and not Playboy. Well, I didn't tell you what else I saw last night. But anyway. This is abuse of discretion, right? Yeah. Well, yeah, because now there's no question. The law is crystal clear. You've got Sleecraft and you have Brookfield. The judge applied the substantive law of Sleecraft, the question of trademark infringement, all eight factors. She applied the procedural law. There's a preliminary injunction motion. She applied the procedural law of Brookfield. No question about it. There's no guessing. No guesswork went on at the trial court. We'll get to tarnishment later, which is not even what we'll get to it. And so now this court reviews a trial court's findings, which is what the area we're into here. We're not really into the law. Under a plausibility standard, that is, is her decision plausible? And whether or not this court might have weighed factors differently, that's the interstellar case, interstellar starship case, or even if this court might come out another way if it looked at all those factors, that's the sports form case, all nine circuit. You don't just reverse the trial court because you might have looked at those factors slightly differently or even potentially even dramatically differently if there's plausibility. And now Judge Peckman's decision was on December 16th. And actually thereafter, Judge Pragerson decided the Mattel against Walker Mountain case. That was December 29th. And in that case, the bar has been raised even higher for overturning an injunction of this nature because once a literary title, which is what Playmakers is, is chosen, and that title is relevant to the underlying work, it can't be enjoined unless it explicit because of First Amendment considerations, it can't be enjoined unless it explicitly misleads. That means, in other words, if the title said something like Playmakers, the Seattle-based sports business agency located it, whatever, that was the title that explicitly misled the public into thinking that it indeed came from something. There's no explicit misleading here. Indeed, clearly, this title is relevant to the series, and it doesn't even implicitly mislead anyone as to whether or not there's a relationship between ESPN and this sports agency on this record. This is a reverse confusion case. It's not a dilution case. That's the claim that's being made here. In this circuit, reverse confusion is a very limited doctrine. It's limited to where the parties provide identical or at least logically related services or products. Most cases in the Ninth Circuit find against someone who's claiming reverse confusion, and probably the outer limit, the very outer limit of a reverse confusion case is the DreamWorks case, but unlike here, in that case, you had both parties in the entertainment movie-related businesses and a strong mark. And the context was different, too, because the Ninth Circuit was saying, in that case, summary judgment should not have been granted to the defendant who was seeking to have the summary judgment grant affirmed. The court said, genuine issue material fact as to whether or not there's a likelihood of reverse confusion, so let's remand. So there is no case that is remotely near this case in terms of the Ninth Circuit's jurisprudence on reverse confusion, nor should there be, because, you know, it's almost by definition the plaintiff's mark is comparatively weak. We have a definitively weak mark in this case, especially in terms of what is on the record in terms of how much they've used it. And so without significant brand strength built into it through recognition over time, their mark is incapable of being seen as a potential entrant into other fields, which is the typical case that you get where you have a forward confusion case. That's someone with a real brand who's out there making something of it and potentially is seen as being able to exploit that brand into other areas of trade, claims that some other party should be denied entrance. So in this case, most of the reverse confusion cases, the plaintiff is sort of pleased to be alive in his own field. And that's the framework that we're in here. Mark's similarity, Your Honor, raised it. The word playmaker is used by both parties as both were trying in their own way, totally independent of each other and for their own business reasons, to trade upon the meaning of a term in sports. Someone who makes the big plays. That's it. Well, once you get past that, sure, they both use the same word as hundreds, if not thousands of other companies have, and that's in the trial record. Unlike some other assertions that may have been made here, that's in the trial record. There are many other companies out there who have used this designation. You have plays. You have bobblehead dolls. You have sports-related companies. You have all kinds of companies who are using this. So once you get past the fact that ESPN and the plaintiff use the same mark, the way each party presents that brand are completely dissimilar, as Judge Peckman pointed out. And we even produced the brands as used in our briefs at page 29 for you to look at yourselves. So there's no similarity in context. And now here, what tips the balance? Remember, Judge Peckman's charter is to weigh each factor individually as the case is presented to her. What's important on the facts of every case when you do one of these trademark infringement matters? And what really tips the balance on mark similarity in this case is ESPN's house brand. I think there's no question that they're not similar once they're presented. But even if you wanted to look at what else is presented, it's ESPN's house brand that makes a tremendous difference because it's always or almost always used in the title. And that means a lot in this case because the services are so dissimilar. This house brand, ESPN, dispels confusion. Unlike — Language underneath it. Right, Judge. There's another Ninth Circuit case. Let me compare it to another Ninth Circuit case called Russ Berry. It's the Wedding Bears case. It's cited in our brief. Russ Berry is a well-known creator of plush dolls. And so a company came out with a Wedding Bear brand doll. Little company. Out comes Russ Berry with another Wedding Bear brand doll. So you have two companies producing the identical, identical product. And Russ Berry claiming, well, we use our house brand. Well, that really doesn't dispel confusion because Russ Berry is known for making bears. That hurts. That makes it seem like the other guy is infringing Russ Berry's Wedding Bear mark. That's a completely different case. Here you've got ESPN, which is in the entertainment business, has no connection whatsoever to the agency business, professional agency business. It has no plans. There's no logical connection between the two, as Judge Peckman pointed out. In this case, that house brand makes a big difference, and it would dispel any confusion, even though if that house brand was not used, there still wouldn't be similarity sufficient to generate a likelihood of confusion, as Judge Peckman said. Well, is it your entertainment series brand, is it always used as it's listed on page 29 with the language underneath, NESP, original entertainment series? Virtually always. Not completely always. For example, there might be a radio spot for, you know, you're not always going to see the brand visually presented, but the way that you can tell that, first of all, it's just logical. Anyone who talks about, look at the record, look at what the publicity that's been generated, and it hasn't been, it was controversial. The controversy was what light it may or may not have put players in that might have disparaged the league. It has nothing to do with tarnishing any of the other companies that use the name. There certainly isn't any proof of that in the record, just as Your Honor pointed out. But let's go back to Your Honor's point. Everyone who discusses that program refers to Playmakers as ESPN's program. Everyone knows that's ESPN's Playmakers. There's no doubt about that. So there again, that brand, whether it's, you know, whether it appears right beneath the word Playmakers every time, and it usually does almost all the time, but even if it doesn't, the public knows. We're talking about public, you know, what the public knows. The public knows that's an ESPN program. So there's your similarity is just not even an issue. Tarnishment. Tarnishment assumes reverse confusion, which means likelihood of confusion. In order to have reverse confusion, you have to have a likelihood of confusion. Tarnishment is not relevant when there's no confusion, because maybe, you know, if someone feels tarnished, that's not really relevant. There's no causation unless the tarnishing is as a result of a perception that there's a relationship between the two companies using the same brand. That hasn't been proved here. That's what the sleek craft factors are about. You go through the sleek craft factors to see whether there's a likelihood of confusion such that there might be tarnishment, but there can't just be a pure cause of action for tarnishment sitting out there in the thin air. The problem here is there's no proof of a likelihood of confusion on the record, and so we're almost talking about developing a new tort, which is like a standalone tort, which is no circuit, no court anywhere in this country has adopted or accepted. Tarnishment could go to there's a likelihood of confusion and the damages are X, because this has been a really tough brand for my client to be associated with, because there's an official, there's a perception of official relationship. There's no proof of that in this record, and therefore, tarnishment is irrelevant to this case. And as I say, the judge evaluated all the clearly appropriate factors under sleek craft that this court requires. All right. The word playmakers appear in the dictionary. I believe the word playmakers is in the dictionary, Your Honor. If it is not in, I think we have one dictionary, I think there's one dictionary site in the record. Oxford Dictionary. I'm not sure it's in the OED, but there is no doubt, and there is complete agreement between the parties on this record, that playmakers has a very distinct meaning in sports. Just as counsel described, the playmaker is the person who makes the big plays. And that meaning of the word applied before ESPN came out with its program and applies after ESPN came out with its program. That word hasn't changed. The meaning of that word hasn't changed. And if it did, well, then the negativity would be a problem for the defendant that this court would not redress, because they're the ones who chose a name to begin with that they knew other members of the public would seek out occasionally, and hundreds have, it's all in the record, because of the positive connotation that it has had. So they assume the risk that if it gets negative, this happens, you know, plenty of words, the meaning of words changes over time, but that's no cause for a finding of liability unless there's a likelihood of confusion, under reverse confusion theory, which is very narrow and ought to be in this circuit. So we're far, far away from any meaningful point which Judge Peckman should be reversed. Gotcha. Heard enough, Judge? Yeah. You got anything else? No, I don't think so. Of course, I have more, but I got you. You have, huh? Your Honor, very briefly, the notion that reverse confusion is narrow in this circuit is flatly wrong. Your law clerks will tell you that. Reverse confusion is a strong doctrine in this case, and DreamWorks stands for it, Foursquare. It is a case. Are you going to tell me this? I said if your law clerks can pull this out. Counsel said it was a narrow concept in this circuit. I'm saying that's wrong. It is broadly used in this circuit. DreamWorks is the prototypical case for it. Reverse confusion is where a senior user who is small has a mark. A junior user who is large and powerful and dominates and overwhelms the market with advertising sets up a situation in which someone might conclude that the senior user, DreamWorks or Playmaker, is trying to trade on the junior user's publicity and or where there is tarnishment. That's the law in this circuit. The housemark in a reverse confusion case, which this is, the use of a housemark exacerbates the problem. It doesn't help it. In a normal direct confusion case, use of a housemark has been said that maybe it will, maybe it won't help. In a reverse confusion case such as this one, the use of a housemark exacerbates the problem because, as in this case, this is all in the record, ESPN features itself as in the sports business, the dominant intergalactic sport medium in the world. It puts Playmakers on T-shirts. It puts Playmakers on hats. It has sports bars. It has places that rate players for going to college and that rates players' likelihood of going into professional football. The Playmaker series used an ESPN sports sideline figure in the program itself. There is an incredible blurring. So when something says ESPN, Playmakers associated with ESPN, that makes it worse because ESPN is all over the sports world. So it makes somebody say, well, gee, I didn't know ESPN was into sports agency. But if it has shown up where they rate players, where they sell T-shirts with Playmakers on it, where they sell hats with Playmakers on it, where they use their reporters as actors in the show, it exacerbates the issue. Maybe it helps you. Your Honor, maybe it does or maybe it doesn't, but it denies, as the Supreme Court said in Park and Fly, Fly and Park, that it denies the holder of the mark, of an incontestable mark, of the right to control its own future. That's the essential, one of the two essential elements of the Lanham Act, to enable a holder of a mark, particularly one that is now incontestable, the right to control the way their mark is perceived in their public. I had one of the early Park and Fly cases. I settled it by telling the truth. It was Park, Shuttle and Fly. You know Park and Fly? Yes. I didn't charge for that at all. And you know, if you give me a good idea, let's go talk to my law clerks. I think I'll call up the Chief Justice and ask him what he thinks. Your Honor, I did not mean any disrespect. All I meant in that sense is I think it's not a complicated... Whatever I suggest, he'll say no. Don't worry about it. Your Honor, the... He's not going to make the call, don't worry about it. You remind me so much of Ted Goodwin, for whom I clerked. What did you say? I said, you remind me so much of Ted Goodwin, for whom I clerked, in the way in which you are addressing counsel. That's a high comment. Well, I think it is too, both ways, Your Honor. Yeah, but you look older than Ted Goodwin. You're not chasing those horses, you know. Well, he and I are the same age. We're the class of 23. Your Honor, please take a careful look at the tarnishment issues. It's important for the district as well as for this case. The only other point I would make is when the district court was looking at the preliminary injunction, counsel for ESPN Playmakers introduced evidence into the record of a statement by Michael Eisner, who is the chairman of Disney, that is the owner of ESPN, that the series would not be resumed. In arguing the preliminary injunction motion of irreparable harm, that evidence was presented to the court. It was flatly denied by ESPN's counsel. And, in fact, it was canceled. So at the time of the preliminary injunction hearing, as is true now, the series was done. It was over. What does ESPN stand for? Entertainment Sports Programming Network, Your Honor. What is it? Entertainment Sports Programming Network. But it really hasn't used those words for a long, long time. It's been more than 10 years since they've actually been used. Originally, that's what it meant. What word is that? What haven't they used for 10 years? Sorry, Judge? What did you say they haven't used? They're continuing to use the acronym, but they never spell it out anymore. It's never spelled out anymore. Oh, okay. I don't think I ever watched that statement. Your Honor, their trademark application asks that Playmakers be trademarked for them as a television show about football. We target football players. Thank you, Your Honor. Okay, thanks. Enjoyed it very much.
judges: Pregerson, Thompson, Callahan